UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHN HICKEY,

           Petitioner,

    v.

DANIEL PARAMO,

           Respondent.

No.  2:13-cv-2627 KJN P

ORDER AND FINDINGS &
RECOMMENDATIONS

I.  Introduction

       Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2012 conviction of assault on a peace officer, resisting arrest, and child endangerment.  (ECF No. 8 at 1.)  Petitioner raises four[1] claims in his amended petition:  the trial court erroneously excluded evidence; there was insufficient evidence in support of count three; prosecutorial misconduct; and the trial court erred by failing to instruct on unanimity with respect to count three.

       After careful review of the record, this court concludes that the petition should be denied.

---

[1]  In his traverse, petitioner included an argument concerning an allegedly erroneous jury instruction.  (ECF No. 22 at 18-19.)  However, such a claim was not included as a ground in the amended petition.  (ECF No. 8 at 5-15.)  Petitioner appended the argument from his petition for review filed in the California Supreme Court, and included the argument concerning this jury instruction claim, but he crossed out both the description of such claim and the argument.  (ECF No. 8 at 22-23.)  Therefore, this jury instruction claim is not properly before the court.

1

1  II.  Procedural History

2      On February 15, 2012, a jury found petitioner guilty of three counts of assault with a

3  firearm upon peace officers with enhancements for personal discharge of a firearm, two counts of

4  resisting a peace officer, exhibiting a firearm in the presence of a peace officer, and two counts of

5  child endangerment.  (Clerk's Transcript ("CT") at 565.)  On March 14, 2012, petitioner was

6  sentenced to serve an aggregate term of 49 years, 4 months in state prison.  (CT 559-60, 563;

7  Respondent's Lodged Document ("LD") 11.)

8      Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

9  District.  The Court of Appeal affirmed the conviction on July 31, 2013.

10     Petitioner filed a petition for review in the California Supreme Court, which was denied

11  on October 30, 2013.

12     Petitioner filed his original federal petition on December 3, 2013.  (ECF No. 1.)

13  III.  Factual History[2]

14     In its unpublished memorandum and opinion affirming petitioner's judgment of

15  conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

16  following factual summary:

17                     Prosecution Evidence

18         On the afternoon of February 9, 2010, seven deputies from the
           Butte County Sheriff's Department went to defendant's residence at
19         202 Grimy Gulch Road in Bangor, California, to serve a search
           warrant for firearms and ammunition. The deputies all wore
20         clothing that identified them as sheriff's deputies. The deputies
           discovered that the only gate to defendant's residence was locked
21         with a padlock and chain.  Defendant's residence appeared to
           consist of two single-wide trailer homes that were placed several
22         feet from each other.  Cars and debris littered the rest of the large
           property. The deputies pushed over a weak part of the wire fence
23         and went to the first door of the residence they came upon. Deputy
           Aaron Staup knocked loudly on the door and yelled several times,
24         "Sheriff's office, search warrant, demanding entry."  One of the
           deputies kicked the door open and discovered it was "a dead end"
25         to a small room.

26

27  [2]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate
     District in People v. John Lee Hickey, No. C070698 (July 31, 2013), a copy of which was lodged
28  by respondent as Lodged Document 11 on July 11, 2014.

                                    2

The deputies proceeded to the north side of the residence, where they repeated the knock/notice procedure at another door. Every window of the residence was covered so the deputies could not see inside. Approximately 30 seconds after the knock/notice, one of the deputies unsuccessfully tried to kick the door in. Kimberly Hickey -- defendant's wife at the time -- was in a bedroom of the trailer, getting ready to attend a domestic violence class.[FN2]  She heard the deputies knocking and repeatedly announce themselves and that they were there to search for weapons.

[FN2:  Due to shared surname and for the sake of clarity, we refer to members of the Hickey family by their first names.]

Deputy Will Olive located a nearby axe and created a small hole in the door next to the door handle.  Almost immediately after the hole was formed, someone on the other side of the door jabbed a large wooden stick through the door at Deputy Olive.   The stick "punched" Deputy Olive in the chest and took him by surprise.  The stick was quickly withdrawn.

From inside the trailer, a male -- later identified as defendant -- began to shout, "Get the fuck off my property!" and, "The kids aren't here."  Defendant also threatened to shoot the officers.  The deputies immediately took cover behind a truck located 15 yards away from the door.  A couple of minutes later, Deputy Staup heard defendant say, "I can see you behind the truck, see you behind that truck, and I'm going to shoot you."  Deputy Staup ran to one of the patrol vehicles to retrieve a sniper rifle because he had special training as a sniper for the SWAT team.  He retrieved his rifle and scope from the patrol vehicle.  Though he was 64 yards from the trailer, the rifle scope's magnification made it appear only five yards away.  Through the scope, Deputy Staup saw a hand stick out of the hole of the door, waving a revolver in the direction of the deputies at the perimeter.   Deputy Olive testified defendant "[s]tarted yelling he was going to kill us; calling us fucking pussies; telling us to come do our job; telling us if we wanted a standoff, we have one now; telling us he had bullets that would go through metal; yelling that he could see us behind the truck; we wouldn't see our families tonight."   The deputies sought cover behind vehicles.

Deputy Staup tried to calm defendant down by telling defendant they "weren't there for kids" but only to serve a search warrant for firearms.  The deputy also asked whether there were any children present, but defendant did not respond.   Defendant nailed something over the hole in the door.  The deputies heard loud banging and the use of a power saw from inside the residence. Kimberly testified defendant was cutting the floor because he was angry.  Defendant told her "he wasn't going to give up because he wasn't going to be locked in a cage."

Defendant's mother, Edna, and a friend named Kenny arrived about an hour later and rammed her car into the still-closed gate until they were able to drive onto the property.  Edna appeared to be very upset, angry and told the deputies she wanted them arrested for

3

trespassing.  She also told the deputies that "if she had the guns, she would kill [them] herself."  Edna denied there were any children in the residence, telling the deputies they were all at her house.  Edna and defendant communicated several times, and she relayed the offer that "[i]f he would come out unarmed onto the porch and talk," the deputies would put guns down.  The deputies also offered medical assistance when they learned defendant and his wife had heart problems.  Edna remained at the property for a couple of hours before she left.

Several times during the standoff, the deputies believed defendant would come out of the trailer.  At other times, defendant would yell that he could see the deputies behind the truck and threatened that he had armor-piercing rounds.

Shortly after 4:00 p.m., a shot rang out and Deputy Staup heard "BB's falling around [him]" that "indicated a shotgun" had been fired in his direction.

At approximately 8:30 p.m., Sergeant Steve Boyd set up a command post for the 16 members of his SWAT team that had arrived at the property.  The SWAT team members formulated a plan to retrieve Deputy Martin, who had been the sole officer on the east side of the property for more than six hours.  Sergeant Boyd made his way toward Deputy Martin's position along with a team that included Sergeant Bell, Deputy Allen, Sergeant Collins, and Detective Nicodemus.  They used bolt cutters to cut through a fence on the east side of the property. Sergeant Boyd heard defendant call out, "I see you by the pole."  The SWAT team members were standing next to a telephone pole at the time. Sergeant Boyd heard six gunshots from what sounded like a big gun being fired from the trailer toward his position.  Sergeant Boyd grabbed Deputy Martin and threw him to the ground before himself taking cover on the ground.  None of the deputies was injured.  After about four minutes, the officers retreated.

Around midnight, one of the officers unsuccessfully attempted to shoot out a light on the trailer.

At approximately 2:00 a.m., SWAT team officers fired a total of 10 gas canisters under the trailer to get defendant to surrender.  Shortly thereafter, Sergeant Boyd saw a weapon being fired from the trailer. There were a lot of rounds fired at that point. At 2:50 a.m., Officers Love and Bailey were positioned approximately 70 to 75 yards to the southeast of the residence.  Officer Love heard six rounds fired from the trailer.  Officer Love twice heard "the sound of bullets going through the grass about 30 feet to [his] right."  The first time the grass was hit, the bullet seemed to come from small-caliber fire and the second time from a shotgun.

During the fifth shot, Officer Love saw "a big flash of the muzzle blast" that seemed to be aimed directly at him and Officer Bailey. Officer Love also heard "multiple pellets going past [them]." Officer Bailey returned fire.  Immediately after Officer Bailey's shot, defendant fired directly back at them.  Officer Love fell to the

ground and yelled, "I've been hit."  Officer Bailey radioed for help in evacuating from the post.  After a short while, Officer Love realized he had not been shot.  Instead, he had been knocked down from the gas and dirt resulting from Officer Bailey firing his gun.  As Officers Love and Bailey were being evacuated, defendant yelled out, "man the fuck up," he had gotten his "second wind," and again called the officers "pussies."  Defendant then yelled he had explosives in the trailer.

The Butte County SWAT team was replaced by the Redding Police Department SWAT team, which remained through the night.  When the Butte County team returned the next morning, they used a heavily armored vehicle to switch team members from various positions around the property.

Sometime after midnight and before the end of the standoff, defendant told Kimberly he had shot and hit an officer.  He also said "he was going to make law enforcement shoot him and he would not surrender."

Just as the officers were finalizing a plan to redeploy gas canisters to the trailer at 2:00 p.m., Kimberly and two children ran out of the trailer.  She had delayed leaving because she was afraid defendant would kill himself.  Kimberly was crying and appeared to be shaken and scared.

At 3:33 p.m., the Chico Police Department SWAT team used the armored vehicle to approach the trailer, puncture it, and send in three gas canisters.  As a result, defendant came crawling out of the trailer holding a stick.  Defendant appeared to be very apologetic and asked if anyone had been hurt.  Upon being informed an officer had been shot, defendant began to cry and told the officers "he was sorry, he didn't mean to hurt anybody."  The officers called for medical attention because defendant was complaining about his heart.

Defense Evidence

Defendant testified on his own behalf as follows:  He and Kimberly had lived at 202 Grimy Gulch Road for 17 years.  They had 10 children together.  However, most of the children were not living with defendant and Kimberly.  Four had run away, and defendant had taken three out of town to protect them after the police had previously shown up at the property.

On February 9, 2010, the only children at the residence with defendant and his wife were Michaela and Jesse.  Earlier that day, defendant called the Oroville Police Department to try "to get aid for [his] children."  Defendant planned to take Kimberly to a parent support group later that day.  Defendant was in a great deal of physical pain and lay down to rest before taking her to her appointment.  Defendant awoke to the sound of pounding, noise, and screaming.  Defendant's children were screaming, "Help us, Daddy. Help us."  Defendant did not know what was going on.

5

Defendant got up, took his stick with him, and went to the door. He felt a strong urge that he needed to defend his family. He placed the stick through the hole in the door and fell to his knees without the aid of the stick. Kimberly and the children were in the other trailer on the opposite side of their residence.

Defendant recalled talking with his father on the phone but could not remember for how long. He was experiencing "extreme mental distress" because he was "not getting help" for "what was going on in [his] life." Defendant was not aware of what was going on outside the trailer because the windows were all covered.

At some point, defendant heard sounds "like bricks or wood or rocks" being thrown against the trailer. In the chaos, he "was trying to defend [his] kids." Defendant "just lost all track of time and everything, and [did not] know what [he] was doing at that time."

Defendant had firearms in the trailer, which he used "[c]ountless times" to shoot at trees and other targets on the property. He was aware there was a restraining order against him, but was unable to read it and therefore did not know he was prohibited from possessing firearms.

At some point during the night, defendant thought he had been shot by a shotgun. He yelled for his children to "[g]et on the floor." He "vaguely" heard Kimberly and his children coughing and gagging but never was aware of any tear gas inside the trailer.

Defendant eventually made Kimberly and the children leave even though Kimberly said, "I want to stay with you till the end." Later, when white gas filled the trailer, defendant slid out of the trailer on his stomach because he weighed 335 pounds at the time. The officers ran up to him, insulted him, and hit him repeatedly with their knees.

Rebuttal Evidence

Called by the prosecution, Kimberly testified defendant was present with her in court on May 11, 2009, when she and defendant were ordered not to have any firearms. When the deputies showed up to serve the search warrant on February 9, 2010, defendant was not asleep as he had claimed. Instead, defendant and Kimberly were on the porch getting ready to attend a domestic violence class.

Detective Chris D'Amato worked as a hostage negotiator during the standoff. He testified defendant told him over the telephone: "I'm well versed in the arts of death." "Nothing wrong with my trigger finger." "I see the people behind the truck, and I will shoot them." "Kim's not here, nobody's here." "You are forcing my hand, there's going to be a barrel full of pigs, it's going to be loud." "It's going to go real fast. I got my second wind, enough to end the game." "I have more than one gun, but it's not the guns you should be worried about."

////

6

Detective D'Amato noted defendant was extremely upset his children had been taken from him.  Defendant also expressed concern about his daughter having been raped.  The detective tried to get more information about the alleged rape, but defendant's responses on the subject were vague and disjointed.  Detective D'Amato learned the incident had been reported to the sheriff's office and involved "underage kids engaging in sexual activity" and "definitely wasn't rape."  Defendant believed there had been an injustice for lack of prosecution.  Defendant also suggested the standoff could be ended by bringing his children to him.  Eventually, defendant unplugged the telephone.

People v. Hickey, No. C070698, 2013 WL 3968350, at *1-5 (Cal. Ct. App. July 31, 2013)(LD 11 at 2-9).

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 4 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529

7

U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct.  Id.  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue.  Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. [3]  Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 412.  See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

---

[3]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

1   'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v.

2   Richter, 131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

3   Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

4   must show that the state court's ruling on the claim being presented in federal court was so

5   lacking in justification that there was an error well understood and comprehended in existing law

6   beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786-87.

7       If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

8   court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford,

9   527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

10  (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

11  § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

12  considering de novo the constitutional issues raised.").

13      The court looks to the last reasoned state court decision as the basis for the state court

14  judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

15  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

16  previous state court decision, this court may consider both decisions to ascertain the reasoning of

17  the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a

18  federal claim has been presented to a state court and the state court has denied relief, it may be

19  presumed that the state court adjudicated the claim on the merits in the absence of any indication

20  or state-law procedural principles to the contrary." Richter, 131 S. Ct. at 784-85. This

21  presumption may be overcome by a showing "there is reason to think some other explanation for

22  the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797,

23  803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims

24  but does not expressly address a federal claim, a federal habeas court must presume, subject to

25  rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 133 S. Ct.

26  1088, 1091 (2013).

27      Where the state court reaches a decision on the merits but provides no reasoning to

28  support its conclusion, a federal habeas court independently reviews the record to determine

9

1   whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

2   Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

3   review of the constitutional issue, but rather, the only method by which we can determine whether

4   a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

5   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

6   reasonable basis for the state court to deny relief."  Richter, 131 S. Ct. at 784.

7         A summary denial is presumed to be a denial on the merits of the petitioner's claims.

8   Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze

9   just what the state court did when it issued a summary denial, the federal court must review the

10  state court record to determine whether there was any "reasonable basis for the state court to deny

11  relief."  Richter, 131 S. Ct. at 784.  This court "must determine what arguments or theories . . .

12  could have supported, the state court's decision; and then it must ask whether it is possible

13  fairminded jurists could disagree that those arguments or theories are inconsistent with the

14  holding in a prior decision of [the Supreme] Court."  Id. at 786.  The petitioner bears "the burden

15  to demonstrate that 'there was no reasonable basis for the state court to deny relief.'"  Walker v.

16  Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 131 S. Ct. at 784).

17        When it is clear, however, that a state court has not reached the merits of a petitioner's

18  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

19  habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

20  F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

21  V.  Petitioner's Claims

22        A.  Exclusion of Evidence

23        Petitioner claims that the trial court erroneously excluded evidence that petitioner believed

24  he was defending his children against past and potential acts of abuse committed against them

25  within the public system for foster care.  Petitioner states that he was denied his fundamental right

26  to present evidence by the trial court's exclusion of evidence that petitioner believed the officers

27  were there to take his children back into foster care, and that the children faced abuse in the

28  public foster care system.  Information that petitioner's daughter was the victim of a rape or

sexual assault while in the foster care program was withheld from the jury. Petitioner objects that the evidence was offered to support a defense of unreasonable self-defense, but rather was offered to show petitioner's knowledge and understanding of the officers' "lawful performance of duty" element. Petitioner argues that the alleged rape evidence was critical to show that he thought the officers came on the property without a warrant, violently, and with the intent to take his remaining children with possible harm to them in the near future. (ECF No. 8 at 20.) He contends that the credibility of his defense depended on whether there was some reason for him to think that his children were exposed to harm in foster care.

Respondent argues that this court is bound by the state court's determination that under state law, defense of others required an actual fear of imminent harm, and that such a defense did not legally exist as to charges of assault on and resisting peace officers. (ECF No. 18 at 23.)

In reply, petitioner argues that the trial judge denied petitioner his necessity defense because the judge precluded admission of the evidence that petitioner's daughter had been molested while in foster care, the trial judge also denied petitioner the right to show the jury his state-of-mind during the incident at issue here. Petitioner points out that although the jury eventually learned that petitioner thought his daughter had been raped, Detective D'Amato's research only confirmed that there had been unidentified sexual conduct among underage kids while in foster care, and the judge instructed the jury to consider this information only to show that there had been an investigation. Petitioner contends this instruction prohibited the jury from considering the evidence for its truth, despite the fact that an administration hearing upheld petitioner's daughter's complaint that she had been digitally penetrated. (ECF No. 22 at 16.)

The last reasoned rejection of petitioner's first claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court addressed this claim as follows:

I

Exclusion of Evidence of Alleged Sexual Assault on Defendant's Daughter

Defendant contends the trial court erred by excluding "evidence

11

that [his] daughter had been molested while in foster care, that he knew of the molestations, and that his resistance was motivated by a reasonable apprehension that the officers were on his property to take the children back to foster care." In so arguing, defendant concedes he acted "unreasonably" in "defense of his children." As defendant notes, his argument depended on his belief his daughter, C., was raped while she was in foster care. As we explain, the argument has no merit.

A.

Exclusion of Evidence Regarding Alleged Rape of Defendant's Daughter

Prior to the start of trial, the prosecution made a motion "that the alleged sexual assault of the defendant's daughter should be excluded as both irrelevant and prejudicial and a waste of time." The prosecutor informed the court the allegation arose from an incident in May 2009, when "the defendant's son allegedly saw his 15-year old sister cuddling up and getting felt up by the foster mother's 23-year-old son. That son by the name of James told [defendant] about this particular activity, in which the defendant spoke to his 15-year-old daughter, who said it didn't happen and was apparently, quote, unquote, 'uncooperative.'" During an investigation into the claim, the daughter, C., denied there was any sexual activity. Thereafter she gave defendant a letter stating she was touched sexually. Defendant then reported the incident to the Butte County Sheriff's Department in August 2009. C. later claimed the contact was consensual.

The prosecutor also noted all 10 of defendant's children were removed from his home in January 2009 based on allegations he had been abusing them with a baseball bat. Two of the children, Michaela and Jesse, ran away from their foster care placements and were at defendant's residence on February 9, 2010. At the time, defendant was under a restraining order prohibiting him from having any contact with his children because "he was not following the Court orders of family court in that he was not testing for drugs, he was not attending anger management, and he was not attending supervised visitations in an appropriate manner." Neither Michaela nor Jesse made any allegations of abuse while in foster care.

Defense counsel opposed the motion, arguing that if the prosecution were going to allow Detective D'Amato to testify, the allegation of rape would provide the necessary context. The defense explained that "it certainly has to be understood as far as a context as to what was taking place at the time that law enforcement was having its contact with [defendant] at the Grimy Gulch Road address."

The trial court granted the motion to exclude, stating:  "The Court has carefully considered counsel's motions in limine and argument on this issue.  I have reviewed Evidence Code 210, which is cited by the People, and also Evidence Code 352. [¶]   The Court is granting the motion to exclude the alleged sexual assault of Defendant's daughter as irrelevant.  I find that it would confuse the issues before this jury.   Just the People's recitation of the underlying chronology of the children being removed and then C[.]'s statements, various statements, indicate to this Court that a discussion of those issues in this trial would be confusing to the jury and would take up an undue consumption of time, would create a mini trial for the allegations.   [¶]   And, I've looked at every possible way in which those statements could be probative to issues before this jury or to an affirmative defense of any kind, and I do not find that there is any relevance to the allegations for the crimes that the defendant is charged with."

## B.

## Unreasonable Self-defense Was Not an Available Defense

We agree with the trial court that the alleged sexual assault of C. had no probative value and offered no defense to the charges against defendant.

In his argument, defendant fails to mention a critical fact:  C. was not present in the trailer or at the property during defendant's standoff with law enforcement.  As the California Supreme Court has held, "both self-defense and defense of others, whether perfect or imperfect, require an actual fear of imminent harm." (People v. Butler (2009) 46 Cal.4th 847, 868.)  Defendant was not entitled to rely on his belief that C. had been sexually assaulted seven months before the standoff to justify his shooting at the officers.  Because C. was neither in the trailer nor even on the property with defendant during the standoff, defendant could not have tendered a defense based on defense of C.

Moreover, defendant concedes he engaged, at best, in unreasonable self-defense.   Unreasonable self-defense applies to charges of murder, not assault on or resisting peace officers.  As the Supreme Court has explained, " 'imperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter.'" (People v. Michaels (2002) 28 Cal.4th 486, 529.)  Thus, "'[f]or killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend.  [Citation.]  If the belief subjectively exists but is objectively unreasonable, there is "imperfect self-defense," i.e., "the defendant is deemed to have acted without malice and cannot be convicted of murder," but can be convicted of manslaughter.  [Citation.]'"   (People v. Battle (2011) 198 Cal.App.4th 50, 72, italics added.)The defense of imperfect self-defense negates for the charge of murder "the crucial characteristic of 'malice aforethought' . . ., i.e., awareness that

one's conduct does not conform to the expectations of society" so that reduction to voluntary manslaughter is appropriate. (People v. Hayes (2004) 120 Cal.App.4th 796, 802.)  By contrast, "[a] person who carefully weighs a course of action, and chooses to kill after considering reasons for and against, is normally capable of comprehending his [or her] societal duty to act within the law. 'If, *despite such awareness*, he [or she] does an act that is likely to cause serious injury or death to another, he [or she] exhibits that wanton disregard for human life or antisocial motivation that constitutes malice aforethought.'" (People v. Hayes, supra, 120 Cal.App.4th at pp. 802-803.)  However, the charges of assault on and resisting peace officers [FN3] do not contain the "element of knowing violation of social norm" and are thus not subject to exoneration for imperfect self-defense. (Id. at p. 803 [rejecting imperfect self-defense for the charge of mayhem because it does not negate any intent to "vex, injure, or annoy"].)

> [FN3: Section 245, subdivision (d) (1), provides, "Any person who commits an assault with a firearm upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for four, six, or eight years."

> Section 69 provides, "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his [or her] duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170, or in a county jail not exceeding one year, or by both such fine and imprisonment."]

Defendant was not entitled to present evidence of his belief that his daughter had previously been sexually assaulted to defend against the charges for which he was convicted. C. was not at the property and thus not in any imminent harm.  And, the possibility defendant's other children might be subject to similar harm later when returned to foster care also did not constitute imminent danger that justified defendant's standoff with law enforcement. Accordingly, the trial court did not err in excluding the evidence from trial.

People v. Hickey, No. C070698, 2013 WL 3968350, at *5-7 (Cal. Ct. App. July 31, 2013) (LD 11 at 9-13).

Criminal defendants have a constitutional right, implicit in the Sixth Amendment, to present a defense; this right is "a fundamental element of due process of law." Washington v.

14

1  Texas, 388 U.S. 14, 19 (1967).  See also Crane v. Kentucky, 476 U.S. 683, 687, 690 (1986);

2  California v. Trombetta, 467 U.S. 479, 485 (1984).  Necessary to the realization of this right is the

3  ability to present evidence, including the testimony of witnesses.  Washington, 388 U.S. at 19.

4  However, the constitutional right to present a defense is not absolute.  Alcala v. Woodford, 334

5  F.3d 862, 877 (9th Cir. 2003).  "Even relevant and reliable evidence can be excluded when the

6  state interest is strong."  Perry v. Rushen, 713 F.2d 1447, 1450 (9th Cir. 1983).  The Supreme

7  Court has rarely held that the right to present a complete defense was violated by the exclusion of

8  defense evidence under a state rule of evidence.  Nevada v. Jackson, 133 S. Ct. 1990, 1992

9  (2013).

10  State law rules excluding evidence from criminal trials do not abridge a criminal

11  defendant's right to present a defense unless they are "arbitrary" or "disproportionate to the

12  purposes they were designed to serve" and "infringe[s] upon a weighty interest of the accused."

13  United States v. Scheffer, 523 U.S. 303, 308 (1998).  See also Crane, 476 U.S. at 689-91

14  (discussion of the tension between the discretion of state courts to exclude evidence at trial and

15  the federal constitutional right to "present a complete defense").  Further, a criminal defendant

16  "does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise

17  inadmissible under standard rules of evidence."  Montana v. Egelhoff, 518 U.S. 37, 42 (1996)

18  (quoting Taylor v. Illinois, 484 U.S. 400, 410 (1988)).  In general, it has taken "unusually

19  compelling circumstances . . . to outweigh the strong state interest in administration of its trials."

20  Perry, 713 F.2d at 1452.  "A habeas petitioner bears a heavy burden in showing a due process

21  violation based on an evidentiary decision."  Boyde v. Brown, 1172 (9th Cir. 2005).

22  Finally, where exclusion of evidence violates a petitioner's right to present a defense,

23  habeas relief is appropriate only if the constitutional violation resulted in error that "had [a]

24  substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

25  Abrahamson, 507 U.S. 619, 637 (1993), (quoting Kotteakos v. United States, 328 U.S. 750, 776

26  (1946)).  This standard applies whether or not the state appellate court recognized the error.  Fry

27  v. Pliler, 551 U.S. 112, 117 (2007)

28  ////

15

1   ("The opinion in <u>Brecht</u> clearly assumed that the <u>Kotteakos</u> standard would apply in virtually all

2   § 2254 cases.").

3       Here, the trial judge reviewed §§ 210 and 352 of the California Evidence Code,[4] and

4   excluded the evidence regarding the alleged rape of petitioner's daughter on the basis that it was

5   not relevant, would confuse the issues before the jury and would take up an undue consumption

6   of time, requiring a mini-trial for such allegations.  The trial judge found the evidence had no

7   probative value to petitioner's defense and was not relevant to the criminal charges against

8   petitioner.  The California Court of Appeal agreed that the alleged sexual assault of petitioner's

9   daughter had no probative value and offered no defense to the criminal charges.  The Court of

10  Appeal specifically found that because petitioner's daughter C. was not present in the trailer or on

11  the property during the underlying incident, there could be no actual fear of imminent harm.

12  Similarly, the possibility that petitioner's other children might be returned to foster care did not

13  constitute imminent danger that would justify petitioner's standoff with the officers.

14      Moreover, petitioner was given a full opportunity to present a defense.  He testified as to

15  his state of mind during the incident, that he was confused, hearing voices in his head, that

16  everything was "hazy," or like he was in a dream, and claimed he did not know what was going

17  on.  (<u>See, e.g.</u>, RT 888-89; 892; 895; 903; 927; 969-70).  Petitioner testified that he was

18  concerned for his kids and wanted to protect them, and was trying to defend them.  (<u>Id.</u>)  Thus,

19  petitioner was not wholly deprived of presenting his defense.

20      The United States Supreme Court has not "squarely addressed" whether a state court's

21  exercise of discretion to exclude testimony violates a criminal defendant's right to present

22  relevant evidence.  <u>Moses v. Payne</u>, 555 F.3d 742, 758-59 (9th Cir. 2009).  Nor has it clearly

23  established a "controlling legal standard" for evaluating discretionary decisions to exclude the

24

---

25  [4]  Section 210 defines relevant evidence:  "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in

26  reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  <u>Id.</u>  Section 352 provides:  "The court in its discretion may exclude evidence if its

27  probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of

28  confusing the issues, or of misleading the jury."  <u>Id.</u>

1    type of evidence at issue here.  Id. at 758.  Accordingly, the decision of the California Court of

2    Appeal that the trial court's discretionary evidentiary ruling did not violate the federal

3    constitution is not contrary to or an unreasonable application of clearly established United States

4    Supreme Court precedent and may not be set aside.  Id.  See also Knowles v. Mirzayance, 556

5    U.S. 111, 112 (2009) ("it is not 'an unreasonable application of' 'clearly established Federal law'

6    for a state court to decline to apply a specific legal rule that has not been squarely established by

7    [the United States Supreme Court]"); Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per

8    curiam) (relief is "unauthorized" under Section 2254(d)(1) when the Supreme Court's decisions

9    "given no clear answer to the question presented, let alone one in [the petitioner's] favor,"

10   because the state court cannot be said to have unreasonably applied clearly established Federal

11   law); Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011) ("Between the issuance of Moses and

12   the present, the Supreme Court has not decided any case either 'squarely address[ing]' the

13   discretionary exclusion of evidence and the right to present a complete defense or 'establish[ing]

14   a controlling legal standard' for evaluating such exclusions."), cert. denied, 132 S. Ct. 593 (2011).

15        In any event, § 352 of the California Evidence Code is not "arbitrary" or disproportionate

16   to the purposes it was designed to serve.  See Scheffer, 523 U.S. at 308.  Rather, California

17   Evidence Code § 352 is the type of established rule of evidence – pursuant to which evidence

18   may be excluded on the ground that its probative value is outweighed by factors such as

19   confusion of the issues or prejudicial effect – which the Supreme Court has recognized does not

20   impair a defendant's right to present a defense.  See Holmes v. South Carolina, 547 U.S. 319, 324

21   (2006) ("While the Constitution thus prohibits the exclusion of defense evidence under rules that

22   serve no legitimate purpose or that are disproportionate to the ends that they are asserted to

23   promote, well-established rules of evidence permit trial judges to exclude evidence if its probative

24   value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or

25   potential to mislead the jury.")  See also Spillman v. Cullen, 587 Fed. Appx. 412 (9th Cir. 2014)

26   (describing California Evidence Code section 352 as "a neutral evidentiary rule . . . that is neither

27   facially arbitrary nor disproportionate to the purpose it seeks to serve").

28   ////

1    Further, the state appellate court's decision that the evidence was properly excluded is not

2    unreasonable under the facts of this case, notwithstanding petitioner's arguments before the trial

3    judge.  The decision of the California Court of Appeal is not "so lacking in justification that there

4    was an error well understood and comprehended in existing law beyond any possibility for

5    fairminded disagreement."  Richter, 131 S. Ct. at 786-87.  Under the circumstances of this case,

6    petitioner has not met his "heavy" burden to show a due process violation resulting from the trial

7    court's decision to exclude the alleged rape evidence.

8    Finally, the court cannot find that the exclusion of this alleged rape evidence caused a

9    substantial and injurious influence on the jury's verdict.  The evidence against petitioner was

10   strong; he engaged in a standoff with police that lasted 26 hours, during which he fired a shotgun

11   multiple times and verbally threatened the officers, while his wife and two children were nearby.

12   In addition, petitioner's trial testimony was rebutted by multiple officers as well as his own wife.

13   Accordingly, for all these reasons, petitioner is not entitled to federal habeas relief on this

14   claim of evidentiary error by the trial court.

15   B.  Allegedly Insufficient Evidence (Count Three)

16   Petitioner claims that the record contains insufficient evidence that shots were fired in the

17   direction of the three officers named in count three.  Petitioner contends that the shots may have

18   been fired into the air, or in another direction.  He argues that during the time that nineteen

19   shotgun shells were fired from his gun, no one was hurt, which suggests that because he fired at

20   close range, he was not aiming to hit the officers.  (ECF No. 1 at 7, citing RT 660.)  Petitioner

21   contends that because there was no evidence the shots were fired in the officers' direction, the

22   evidence is insufficient to support the convictions for assault with a firearm.

23   Respondent counters that the state appellate court properly applied federal law in finding

24   that the convictions were supported by substantial evidence.  (ECF No. 18 at 25.)  Respondent

25   points to the evidence that each officer was standing in close proximity to a pole on the property,

26   and each officer heard petitioner call out, "I see you by the pole," before hearing six loud shots

27   ring out in their direction, and each officer then dove for cover.  In addition, petitioner had earlier

28   threatened to shoot the officers, and petitioner's wife reported to Detective Nicodemus that

18

1  petitioner admitted to her that he "shot law enforcement" and "hit an officer." (ECF No. 18 at

2  25.) Thus, respondent contends that a fairminded jurist could agree that the state court's ruling is

3  not inconsistent with any Supreme Court precedent, and this claim should be denied.

4      In reply, petitioner argues that each officer only testified that he "believed" he was being

5  shot at, and that petitioner's wife only said what she "believed" she heard her husband say, and

6  therefore there is no actual evidence that petitioner's shots were in the direction of the officers.

7  Petitioner contends that because not one of the officers saw "muzzle" fire and the shots came

8  from a short distance, their testimony alone is insufficient evidence that petitioner shot in the

9  officers' direction. (ECF No. 22 at 21.) Petitioner argues that the evidence fails to show the

10  gunshots would probably and directly result in the application of physical force against Bell,

11  Boyd or Nicodemus; therefore, the state appellate court unreasonably applied federal law to deny

12  relief. (ECF No. 22 at 22.)

13      The last reasoned rejection of petitioner's insufficient evidence claim is the decision of the

14  California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The

15  state court addressed this claim as follows:

16          Evidence in Support of Assault on Officers Boyd, Bell, and
           Nicodemus
17

18          Defendant next contends insufficient evidence supported his
           conviction of assault with a deadly weapon on Officers Boyd, Bell,
19          and Nicodemus. [FN4] Specifically, he asserts there was no
           "evidence that shots were fired in their direction" because "the
20          shots may have been fired in the air, or in another direction." We
           disagree.

21          [FN4: When referring to Sergeant Boyd, Sergeant Bell, and
22          Detective Nicodemus as a group, we use the term "officers" to
           describe their law enforcement status.]

23                              A.

24          Assessing Sufficiency of the Evidence Claims

25          In reviewing a claim of insufficient evidence in support of a
           criminal conviction, we apply the substantial evidence standard of
26          review. (People v. Snow (2003) 30 Cal.4th 43, 66.) "The standard
           of review is well settled: On appeal, we review the whole record in
27          the light most favorable to the judgment below to determine
           whether it discloses substantial evidence -- that is, evidence that is
28          reasonable, credible and of solid value -- from which a reasonable

19

trier of fact could find the defendant guilty beyond a reasonable doubt. (Jackson v. Virginia (1979) 443 U.S. 307, 317-320, 61 L.Ed.2d 560; People v. Johnson (1980) 26 Cal.3d 557, 578.) '"[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder."' (People v. Ochoa (1993) 6 Cal.4th 1199, 1206.) 'The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. (People v. Bean (1988) 46 Cal.3d 919, 932.) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt."' (People v. Stanley (1995) 10 Cal.4th 764, 792-793.)" (People v. Snow, supra, at p. 66.)

### B.  Assault Against Officers Boyd, Bell, and Nicodemus

The three convictions for assault upon a peace officer with a firearm arise out of defendant's firing six shots when a team that included Officers Boyd, Bell, and Nicodemus went to extract Deputy Martin around 8:30 p.m. on the evening of the standoff. As defendant correctly points out, the trial court struck some testimony of Sergeant Boyd and Detective Nicodemus that they each believed they were fired upon.  Nonetheless, the remaining testimony of the officers constituted substantial evidence defendant fired upon Officers Boyd, Bell, and Nicodemus.

Sergeant Boyd testified he and his team -- including Sergeant Bell and Detective Nicodemus -- arrived at Deputy Martin's position on the southeast side of the trailer around 8:30 p.m.  When the officers had cut through the fence to reach Deputy Martin, they heard defendant calling out, "I see you by the pole."  Sergeant Boyd saw "the pole was right next to [them]."  Sergeants Boyd and Bell immediately "moved the team back to get out of the way" by retreating back to the fence.  When they had moved 10 feet, "six shots [were] fired" from the trailer.  The shots were loud.  In response, Sergeant Boyd grabbed and threw Deputy Martin to the ground before himself dropping onto the ground.  Sergeant Boyd worried about being hit because they "were still lighting [themselves] with the moonlight or ambient light."

Sergeant Boyd additionally testified that "when he heard the shot and . . . dove for cover on the ground" he "perceive[d] that [he was] being shot at." As he explained, "I didn't have any doubt that shots were aiming at us. Just because of all the circumstances put together, I didn't have any doubt.  That's why I dove for cover." This testimony was not stricken.

Detective Nicodemus also heard defendant call out, "I see you by the pole."  At the time, he "was standing by a pole."  He also dropped to the ground as soon as he heard the shots "[t]rying not to get shot."  When asked if he perceived the shots coming in his direction, Detective Nicodemus answered that "[a]fter the first two

shots, [he] left the area."  He further testified Kimberly later told him defendant "shot law enforcement" and "hit an officer."

Likewise, Sergeant Bell testified he took cover in the bushes behind the pole after defendant yelled, "I see you by the pole."  Sergeant Bell "tossed" Sergeant Collins on the ground as well.

These trained officers dove for the ground after hearing loud shots fired in their direction by defendant.  Defendant called out their position before firing six shots at them.  He did so after his earlier taunting of the officers that he was going to shoot them and they should not expect to see their families that night.  Sergeant Boyd had no doubt defendant was aiming at him and his fellow officers who had gone to retrieve Deputy Martin.  Moreover, defendant's statements to Kimberly that he shot at the officers and hit one of them provide additional evidence of his assault on Officers Boyd, Bell, and Nicodemus.  The testimony introduced on the assaults against these officers is sufficiently solid and credible to constitute sufficient evidence to affirm defendant's convictions.

People v. Hickey, No. C070698, 2013 WL 3968350, at *8-9 (Cal. Ct. App. July 31, 2013) (LD 11 at 17-19).

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"  Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).  Put another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."  Cavazos v. Smith, 132 S. Ct. 2, *4 (2011).  Sufficiency of the evidence claims in federal habeas proceedings must be measured with reference to substantive elements of the criminal offense as defined by state law.  Jackson, 443 U.S. at 324 n.16.

In conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution."  Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011).  "Jackson leaves juries broad discretion in deciding what inferences

1    to draw from the evidence presented at trial," and it requires only that they draw "'reasonable

2    inferences from basic facts to ultimate facts.'"  Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012)

3    (per curiam ) (citation omitted).  "'Circumstantial evidence and inferences drawn from it may be

4    sufficient to sustain a conviction.'"  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995)

5    (citation omitted).

6         "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging

7    the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."

8    Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  Because this case is governed by the

9    AEDPA, this court owes a "double dose of deference" to the decision of the state court.  Long v.

10   Johnson, 736 F.3d 891, 896 (9th Cir. 2013) (quoting Boyer v. Belleque, 659 F.3d 957, 960 (9th

11   Cir. 2011), cert. denied, 132 S. Ct. 2723 (2012)).  See also Coleman v. Johnson, 132 S. Ct. at

12   2062 ("Jackson claims face a high bar in federal habeas proceedings because they are subject to

13   two layers of judicial deference.").

14        After reviewing the record in the light most favorable to the jury's verdict, the

15   undersigned concludes that there was sufficient evidence introduced at petitioner's trial to support

16   his convictions for assault with a firearm, even though there was no physical evidence confirming

17   the direction of the gunfire.  The reviewing court must presume that the jury believed the

18   testimony of the officers, which was supported by petitioner's wife's testimony that petitioner

19   told her he "shot law enforcement" and "hit an officer."  In evaluating the evidence presented at

20   trial, this court may not weigh conflicting evidence or consider witness credibility.  Wingfield v.

21   Massie, 122 F.3d 1329, 1332 (10th Cir. 1997).  Instead, as noted above, the court must view the

22   evidence in the "light most favorable to the prosecution."  Jackson, 443 U.S. at 319.

23        Juries have broad discretion in deciding what inferences to draw from the evidence

24   presented at trial.  This court may not "impinge[ ] on the jury's role as factfinder," or engage in

25   "fine-grained factual parsing."  Coleman v. Johnson, 132 S. Ct. at 2065.  As the Ninth Circuit has

26   explained, "[t]he relevant inquiry is not whether the evidence excludes every hypothesis except

27   guilt, but whether the jury could reasonably arrive at its verdict."  United States v. Mares, 940

28   F.2d 455, 458 (9th Cir. 1991).  Under Jackson, the Court need not find that the conclusion of guilt

1    was compelled, only that it rationally could have been reached.  <u>Drayden v. White</u>, 232 F.3d 704,

2    709-10 (9th Cir. 2000).

3        For the reasons stated by the California Court of Appeal, a rational trier of fact could have

4    found beyond a reasonable doubt that petitioner intentionally discharged a firearm toward officers

5    Boyd, Bell, and Nicodemus during the standoff at issue here.

6        Therefore, the decision of the California Court of Appeal rejecting petitioner's claim that

7    the evidence was insufficient to support the assault with a firearm convictions is not contrary to or

8    an unreasonable application of <u>In re Winship</u> and <u>Jackson</u> to the facts of this case.  Accordingly,

9    petitioner is not entitled to federal habeas relief on this claim.

10       C.  <u>Alleged Prosecutorial Misconduct</u>

11       Petitioner claims that the prosecutor committed misconduct by arguing that Deputy

12   Nicodemus concluded that he was shot at, a conclusion that was stricken from the record.

13   Petitioner argues that his due process rights were violated when the prosecutor argued that

14   Deputy Nicodemus concluded that he was shot at.  (ECF No. 1 at 8.)

15       Respondent argues that petitioner's prosecutorial misconduct claim is procedurally

16   defaulted because defense counsel failed to make a contemporaneous objection to the

17   prosecutor's statements during closing argument.  Because petitioner failed to demonstrate cause

18   for the default and actual prejudice, respondent contends that this court is barred from considering

19   this issue.

20       In reply, petitioner argues that trial counsel objected during Officer Nicodemus' testimony

21   about shots fired in his direction, and the trial judge ruled that that part of the testimony could not

22   be brought up to the jury.  (ECF No. 22 at 24, citing RT 526-27.)  Petitioner argues this objection

23   was sufficient to preserve the claim for all purposes.  He contends that absent the prosecutor's

24   comment during closing argument, it cannot be said that the jury would not have found

25   differently, and he would have received a lesser sentence.  (ECF No. 22 at 24.)

26       The last reasoned rejection of petitioner's prosecutorial misconduct claim is the decision

27   of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.

28   The state court addressed this claim as follows:

Prosecutorial Misconduct

Defendant contends the prosecutor engaged in misconduct by referring to stricken testimony when she argued evidence showed Detective Nicodemus believed defendant was shooting at him. The Attorney General counters defendant forfeited the claim by failing to make a timely objection to the alleged prosecutorial misconduct or asking the trial court to admonish the jury. We agree the contention has not been preserved for appellate review.

"'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.' " (People v. Fuiava (2012) 53 Cal.4th 622, 679, quoting People v. Riggs (2008) 44 Cal.4th 248, 298.) Under the federal constitution, prosecutorial misconduct results if "the challenged action '"so infected the trial with unfairness as to make the resulting conviction a denial of due process."' (Darden v. Wainwright (1986) 477 U.S. 168, 181, 91 L.Ed.2d 144.)" (People v. Riggs, supra, at p. 298.) However, "'"[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion -- and on the same ground -- the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]"'" (People v. Riggs, supra, 44 Cal.4th at p. 298, quoting People v. Stanley (2006) 39 Cal.4th 913, 952.)

Here, defendant did not object to the alleged prosecutorial misconduct or ask that the jury be admonished.   We reject defendant's suggestion, in his reply brief, that defense counsel's mere objection to the testimony of Sergeant Boyd and Detective Nicodemus should suffice as objections to the alleged misconduct. As the Supreme Court has held, the objection in the trial court must be "on the same ground" as that asserted on appeal.   (People v. Riggs, supra, 44 Cal.4th at p. 298.)   Consequently, the issue of prosecutorial misconduct has not been preserved for appeal.

In his opening brief, defendant does not argue any objection would have been futile or that he received ineffective assistance of counsel for lack of objection to the alleged misconduct.   To the extent defendant raises these arguments for the first time in his reply brief, they are untimely.   (Garcia v. McCutchen (1997) 16 Cal.4th 469, 482, fn. 10.)

People v. Hickey, No. C070698, 2013 WL 3968350, at *9-10 (Cal. Ct. App. July 31, 2013) (LD 11 at 19-21).

24

1    The California Court of Appeal rejected petitioner's challenge on the ground that his

2    counsel had waived the argument by failing to object at the time to the prosecution's comment

3    during closing argument.  In Wainwright v. Sykes, 433 U.S. 72, 97 S. Ct. 2497 (1977), the

4    Supreme Court held that a defendant's failure to make a timely contemporaneous objection under

5    state law, absent a showing of cause for the noncompliance and some showing of actual

6    prejudice, barred habeas corpus review of his claim.  Because the California courts are the final

7    expositors of California law, this court must accept their conclusion that petitioner's failure to

8    timely object violated California's contemporaneous objection rule.  See Sykes, 433 U.S. at 86.

9    The state appellate court's ruling to that effect was not an unreasonable application of clearly

10   established federal law on procedural default.  As the United States Supreme Court has explained,

11   in all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an

12   independent and adequate state procedural rule, federal habeas review of the claims is barred

13   unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

14   alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

15   fundamental miscarriage of justice.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  The Ninth

16   Circuit has held that California's "contemporaneous objection rule" is an adequate procedural bar.

17   Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Sykes, 433 U.S. at 87), abrogated on

18   other grounds by Ross v. Oklahoma, 487 U.S. 81 (1988).  See also Rich v. Calderon, 187 F.3d

19   1064, 1070 (9th Cir. 1999) ("We may not review his six other prosecutorial misconduct claims

20   because [petitioner] procedurally defaulted by failing to make contemporaneous objections, and

21   the California court consequently invoked a procedural bar to their consideration, the validity of

22   which Rich has failed to overcome"), cert. denied, 528 U.S. 1092 (2000); Vansickel v. White, 166

23   F.3d 953, 957-58 (9th Cir. 1999); Garrison v. McCarthy, 653 F.2d 374, 377 (9th Cir. 1981)

24   (petitioner who failed to comply with a state's contemporaneous objection rule, barring appellate

25   review of alleged errors that are not raised at trial by timely objection, was not entitled to federal

26   habeas review of the constitutional claim absent a showing of cause for noncompliance with the

27   state rule and prejudice).

28   Here, petitioner has not demonstrated cause for failing to contemporaneously object to the

1    prosecution's closing argument.  He has also failed to demonstrate actual prejudice or that a

2    fundamental miscarriage of justice will result if this claim is barred.  Under the circumstances

3    presented here, the undersigned concludes that the state appellate court's determination that this

4    claim has been waived by petitioner is not unreasonable and should not be set aside on habeas

5    review.

6          D.  Failure to Instruct on Unanimity (Count Three)

7          Petitioner claims that the trial court erred by failing to instruct the jury on unanimity with

8    respect to count three, and that the instruction on unanimity was required because there were

9    separate factual scenarios which could lead to conviction.  (ECF No. 8 at 29.)  Petitioner argues

10   that one officer could have been more, or less, exposed to being shot, depending on the placement

11   of the shots.  (ECF No. 8 at 30.)  Petitioner contends that there was no evidence of the placement

12   of the shots, and thus no evidentiary support for count three.  To the extent that placement of the

13   shots could be determined, petitioner argues that the evidence differed among the three alleged

14   victims; thus, it was the allegation of multiple victims that triggers the requirement for a

15   unanimity instruction.  Petitioner notes that Officer Bell concluded he was being shot at based on

16   petitioner's statement, not on Bell's perception of where the pellets were directed.  (ECF No. 8 at

17   31.)  Thus, petitioner contends the jurors could disagree as to which officer was an assault victim.

18         Respondent counters that the Supreme Court has not held that a trial court has a duty to

19   *sua sponte* instruct on unanimity.  (ECF No. 18 at 29.)  Thus, respondent argues that petitioner

20   cannot show that the state court's denial of this claim was unreasonable.  In addition, respondent

21   contends that there is no federal constitutional right to juror unanimity, barring petitioner's claim

22   that the trial judge's failure to *sua sponte* instruct on unanimity as to count three violated

23   petitioner's constitutional rights.  (ECF No. 18 at 30.)

24         In reply, petitioner argues that there is no evidence to show all officers were exposed to

25   gun fire that day, and that the evidence shows no officer was actually fired upon as there is no

26   evidence that any officer was hit by gunfire.  (ECF No. 22 at 25-26.)  Although petitioner

27   concedes multiple shots were fired, he argues it was the fact that there were multiple victims that

28   required a unanimity instruction because without such instruction, the jury may have been led to

believe that an officer was in the line of fire, but others were not, and had to find that they all were or else they could not render a guilty verdict for any of the officers.  (ECF No. 22 at 26.)  Petitioner contends that because he has a constitutional right to have the jury find guilt as to each and every element of the crime, the jury must be free to make such determination without obligation, and the failure to *sua sponte* instruct the jury violated his rights under Sandstrom v. Montana, 442 U.S. 510 (1979).  (ECF No. 22 at 26.)

The last reasoned rejection of petitioner's unanimity claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed this claim as follows:

> Failure to Instruct on Juror Unanimity
>
> Defendant contends the trial court erred in failing to give sua sponte a unanimity instruction for the charges of assault upon a peace officer with a firearm as to Officers Boyd, Bell, and Nicodemus. Defendant asserts that "the evidence raises the possibility that some jurors could conclude that one of the officers was shot at, other jurors could conclude that another officer was shot at, and there was no unanimous agreement that any one officer was shot at." We are not persuaded.
>
> A.
>
> Duty to Instruct on Juror Unanimity
>
> It is well settled that " 'a criminal conviction requires a unanimous jury verdict (Cal. Const., art. I, § 16; People v. Wheeler (1978) 22 Cal.3d 258, 265).' [Citation.] What is required is that the jurors unanimously agree [the] defendant is criminally responsible for '*one discrete criminal event.*' (People v. Davis (1992) 8 Cal.App.4th 28, 41, original italics.) '[W]hen the accusatory pleading charges a single criminal act and the evidence shows more than one such unlawful act, *either* the prosecution must select the specific act relied upon to prove the charge *or* the jury must be instructed . . . that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act.' (People v. Gordon (1985) 165 Cal.App.3d 839, 853, fn. omitted, original italics.)" (People v. Thompson (1995) 36 Cal.App.4th 843, 850.)

////

////

In cases in which "the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (People v. Russo (2001) 25 Cal.4th 1124, 1132.)   Thus, a unanimity instruction is not required where different criminal acts are "so closely connected as to form a single transaction or where the offense consists of a continuous course of conduct." (People v. Sanchez (2001) 94 Cal.App.4th 622, 631.)  Nor is the instruction required where "'the acts were substantially identical in nature, so that any juror believing one act took place would inexorably believe all acts took place.'" (People v. Wolfe (2003) 114 Cal.App.4th 177, 184.)  In short, "'[a] unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him [or her] of the crime charged.' (People v. Gonzalez (1983) 141 Cal.App.3d 786, 791, disapproved on another ground in People v. Kurtzman (1988) 46 Cal.3d 322, 330.)  In other words, '[i]f under the evidence presented such disagreement is not reasonably possible, the instruction is unnecessary.'  (141 Cal.App.3d at p. 792; see also People v. Schultz [ (1987) ] 192 Cal.App.3d [535,] 539-540, and People v. Bergschneider (1989) 211 Cal.App.3d 144.)" (People v. Muniz (1989) 213 Cal.App.3d 1508, 1518.)

B.

The Shots Fired at Officers Boyd, Bell, and Nicodemus

Here, the trial court instructed the jury on unanimity only as to the two counts of child endangerment.[FN5]  Nonetheless, we conclude the failure to instruct on unanimity as to the counts of assault upon a peace officer with a firearm was not error because the evidence did not allow the jury to split on the victims or the acts upon which they convicted.

[FN5:  The trial court gave CALCRIM No. 3500 as follows:  "The defendant is charged with child endangerment in Counts 5 and 6[¶]  The People have presented evidence of more than one act to prove that the defendant committed these offenses.  You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."]

The prosecution clearly identified Officers Boyd, Bell, and Nicodemus as the three victims for which defendant was charged with three counts of assault upon a peace officer with a firearm.  Officers Boyd, Bell, and Nicodemus each recounted hearing

defendant yell, "I see you by the pole."  At the time, each of three officers testified he was standing close to the pole.  The officers heard six loud gunshots coming from the nearby trailer, and each immediately dove to the ground in response.  As we have previously noted, Sergeant Boyd testified he had no doubt defendant was aiming at them.

The rapid succession of shots fired at the officers was a series of "criminal acts so closely connected as to form a single transaction" or continuous course of conduct. (People v. Sanchez, supra, 94 Cal.App.4th at p. 631.)  Here, no unanimity instruction was required because the evidence essentially left the jury with an all-or-nothing decision as to whether the shots were fired at Officers Boyd, Bell, and Nicodemus.  The agreement in the officers' testimony about the shots and their proximity to the pole did not allow parsing the evidence to convict on only one or two of the assault charges relating to this portion of the standoff.

Defendant urges us to find error on the basis of our prior decision in People v. McNeill (1980) 112 Cal.App.3d 330.  In McNeill, this court found the trial court erred in failing to give a unanimity instruction for the charge of assault with a deadly weapon that could have been premised on any of "a rapid series of shots in the direction of the victim's four friends."  (Id. at p. 334.)  Even though the defendant was charged with only one count of assault with a deadly weapon, the trial court did not instruct that the jury must unanimously agree on which of the four friends served as the victim for purposes of conviction.  (Id. at pp. 335-336.)  As we explained, "The possibility that the jurors may have come to different conclusions as to the identity of the assault victim vitiates the constitutionally required assurance of juror unanimity as to the assault conviction.  While it is of course possible that the jurors agreed unanimously as to a particular victim of the assault, such agreement would necessarily be fortuitous in the absence of a proper instruction." (Ibid.)

Similarly distinguishable is defendant's cited case of People v. Gibson (1991) 229 Cal.App.3d 284.  Gibson involved a challenge to an enhancement for the defendant's drunk driving that resulted in an injury to more than one person. (Id. at pp. 285-286; former Veh.Code, § 23182.)  The Gibson court reversed the enhancement for failure of the trial court to instruct that the jury unanimously agree on which of the other three victims of the auto accident served as the basis for the enhancement.  (Id. at p. 287.)  The instructions in that case required the jury only believe " 'someone' was injured," even though three different people could have potentially been considered injury victims.  (Ibid.)

29

1

2

3

4

5

> In contrast to <u>McNeill</u> and <u>Gibson</u>, the jury in this case was not asked to select one or two among more potential victims.  Instead, each of the three victims -- Officers Boyd, Bell, and Nicodemus -- was specifically identified for the jury.  And, for each victim there is no way to parse the evidence into differing instances of assault on the officers.   Thus, no unanimity instruction was necessary. (<u>People v. Muniz</u>, <u>supra</u>, 213 Cal.App.3d at p. 1518.)

6

7

<u>People v. Hickey</u>, No. C070698, 2013 WL 3968350, at *10-12 (Cal. Ct. App. July 31, 2013) (LD 11 at 21-24).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

  The California Court of Appeal concluded that, under the facts of this case, the unanimity jury instruction suggested by petitioner was not required under California law.  The state appellate court's conclusion in this regard is not based on a unreasonable determination of the facts of this case.  <u>See</u> 28 U.S.C. § 2254(d).  Petitioner contends the prosecution was required to show that petitioner fired in the direction of all the officers, and that there was no evidence that any officer was actually fired upon or hit by the gunfire.  (ECF No. 22 at 26-27.)  However, seven officers responded to the incident, and the jury found that three officers were the victims of assault by petitioner.  These three assault convictions were supported by the testimony of Officers Boyd, Bell, and Nicodemus, who recounted hearing petitioner yell "I see you at the pole," and recalling each was located close to the pole at that time.  (RT 319-24; 363-64; 524-25.)  Each officer heard loud gunshots coming from the nearby trailer, and each immediately dove to the ground in response.  (RT 319-24; 365-67; 526.)  In addition, Officer Boyd testified that he had no doubt petitioner was aiming at them.  (RT 319, 320.)  Such evidence demonstrates that the state court's finding that petitioner's "criminal acts [were] so closely connected as to form a single transaction" or constituted a continuous course of conduct was not an unreasonable determination of the facts.  As the California Court of Appeal found, "the agreement in the officers' testimony about the shots and their proximity to the pole did not allow parsing the evidence to convict on only one or two of the assault charges relating to this portion of the standoff."  (LD 11 at 23.)

26

27

28

  Further, where, as here, the challenge is to a failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155 (1977).

1   See also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (same).  Petitioner has failed to

2   meet this heavy burden.  Petitioner's reliance on Sandstrom, 442 U.S. at 510, is unavailing

3   because the court in Sandstrom was addressing a potential misstatement of the law, not a

4   complete failure to instruct.  Id.

5          Also, petitioner is not entitled to relief on his claim that the trial court's failure to give a

6   unanimity instruction violated his right to a unanimous verdict.  As a state criminal defendant in a

7   noncapital case, petitioner had no federal constitutional right to a unanimous jury verdict.  Schad

8   v. Arizona, 501 U.S. 624, 635 n.5 (1991) ("a state criminal defendant, at least in noncapital cases,

9   has no federal right to a unanimous jury verdict");  Apodaca v. Oregon, 406 U.S. 404, 410-12

10  (1972) (no constitutional right to unanimous jury verdict in non-capital criminal cases); see also

11  Johnson v. Louisiana, 406 U.S. 356, 359 (1972) (the Supreme Court "has never held jury

12  unanimity to be a requisite of due process of law.").

13         Accordingly, the state court's decision on petitioner's fourth claim was not contrary to, or

14  an unreasonable application of, clearly established federal law, and was not based on an

15  unreasonable application of the facts.  Petitioner's fourth claim should be denied.

16  VI.  Conclusion

17         In accordance with the above, IT IS HEREBY ORDERED that the Clerk of the Court is

18  directed to assign a district judge to this case; and

19         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

20  habeas corpus be denied.

21         These findings and recommendations are submitted to the United States District Judge

22  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

23  after being served with these findings and recommendations, any party may file written

24  objections with the court and serve a copy on all parties.  Such a document should be captioned

25  "Objections to Magistrate Judge's Findings and Recommendations."   If petitioner files

26  objections, he shall also address whether a certificate of appealability should issue and, if so, why

27  and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if

28  the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

31

§ 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  May 17, 2016

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/cw/hick2627.157

32